# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACIE STILL, | ) 1:11cv0637 LJO DLB |
| | ) |
| | ) |
| | ) FINDINGS AND RECOMMENDATIONS |
| Plaintiff, | ) REGARDING PLAINTIFF'S |
| | ) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## BACKGROUND

Plaintiff Tracie Still ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Magistrate Judge for Findings and Recommendations to the District Court.

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff filed her application on November 8, 2006, alleging disability since June 1, 2006, due to neurofibromatosis. AR 96-98, 107-113. After the application was denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

("ALJ"). AR 58-61, 64-68, 70. On June 17, 2008, ALJ William C. Thompson held a hearing in Stockton, California. AR 28-52. He issued a decision denying benefits on April 28, 2009. AR 9-27. On February 10, 2011, the Appeals Council denied review. AR 1-4.

Hearing Testimony

ALJ Thompson held a hearing on June 17, 2008, in Stockton, California. Plaintiff appeared with her attorney, Sengthiene Bosavanh. Vocational expert ("VE") Susan Creighton-Clavel also appeared and testified. AR 28.

Plaintiff testified that she was 43 years old at the time of the hearing. She completed the eighth grade and can read and write. AR 31-32. Plaintiff was 5 feet, 8 inches tall and weighed 155 pounds. She is married with two children, ages 24 and 23. AR 32. Plaintiff lives with her husband, who works in restaurant maintenance. AR 33.

Plaintiff last worked over 2 years ago, for one week, and has not tried to work since June 2006. AR 33-34. She explained that she could not work now because of her back, knees and depression. AR 36. Plaintiff recently started seeing a doctor for depression and was told that she's been depressed her whole life. AR 36. Plaintiff is taking medication for her depression but isn't sure yet if it's working. AR 36-37. Her depression bothers her all day, every day. AR 37.

Plaintiff also explained that her back hurts a lot, though she is not receiving medical treatment for it. She has been taking medication for inflammation. The pain is across the lower part of her back and goes into her legs. Her back hurts 4 or 5 times a day, mostly when she's sitting down and then stands. AR 38. Plaintiff was referred to the University of San Francisco. AR 38. Plaintiff has arthritis in both knees and doctors don't know how to help because of the neurofibroma. AR 38. She received left-knee injections in the past but they did not help. AR 42, 44.

During a typical day, Plaintiff gets up, lets her dogs out, lays back down and then tries to clean up a little. She basically lays on the couch and watches television. She dusts, sweeps and vacuums only once a week because she doesn't have the strength or motivation to do it more often. Plaintiff can vacuum for 10 minutes and then has to stop because it hurts to bend over. Plaintiff doesn't do much cooking but uses the microwave. AR 39. She does not participate in

activities away from home because she doesn't want to go outside or be with other people. AR 40.

Plaintiff thought that she could only walk from the hearing room to the parking lot because of pain in her knees. She does not use a cane, but thought that she should probably have one. She could stand for 10 to 15 minutes at most before needing to stop because of pain in her back and left leg, and dizziness. Plaintiff could sit for 10 to 15 minutes before needing to get up. AR 40. She could take care of her personal hygiene and dress herself. AR 41.

Plaintiff can only sleep after taking over-the-counter sleeping pills. AR 40-41.

When questioned by her attorney, Plaintiff testified that she has very bad varicose veins in her left leg that have burst 3 times in the last 8 months. Her veins cause constant pain and tingling and she can't scratch them for fear that they will burst. AR 42-43.

Plaintiff also has trouble concentrating and forgets everything she reads. She thought she could read for about 10 minutes. AR 45. Plaintiff also forgets to do things and has problems with stress and anxiety. Little things frustrate her. AR 45. Plaintiff told her attorney that she thought she could lift 5 or 6 pounds and sit for 30 minutes at one time. Plaintiff's smoking has increased because she is scared of what's going on. AR 46.

For the first hypothetical, the ALJ asked the VE to assume a person of Plaintiff's age, education and experience. This person could lift 20 pounds occasionally, 10 pounds frequently, stand and walk in combination for 2 hours a day and sit for 6 hours a day. This person could occasionally bend, stoop, twist, squat, kneel, crawl and climb stairs but could not climb ladders or scaffolding. This person could not work at heights and could not operate foot controls. The VE testified that this person could not perform Plaintiff's past relevant work but could perform the light positions of parking lot attendant, office helper and storage facility clerk. This person could also perform the sedentary positions of telephone clerk, charge account clerk and electronics assembler. AR 48-49.

Plaintiff's attorney asked the VE to assume a person who could sit for 4 hours, stand and walk a total of 1 hour and could not run, jump, climb, kneel or crouch. The VE testified that this

1  person could perform the positions previously identified, but the ALJ would need to "look at
2  substantial gainful employment because it's only six hours."  AR 49.
3      If this person could only concentrate for 10 minutes at a time, all positions except
4  electronics assembler would be available.  AR 50.
5      The ALJ asked the VE if all jobs would remain if the person could stand and walk for 2
6  hours total and sit for 8 hours total.  The VE testified that all jobs previously identified would be
7  available.  AR 50.

<u>Medical Record</u>

On January 29, 2007, Plaintiff saw Michael Bass, M.D., for a consultive neurologic examination.  Plaintiff complained of left leg pain and reported a 20-year history of skin lesions from neurofibromatosis.  Plaintiff also complained of low back pain and she believed that one leg was longer than the other.  Plaintiff told Dr. Bass that she quit her job at a dry cleaner on June 1, 2006, because she could not take the leg pain anymore.  In the last five days, Plaintiff developed right upper quadrant pain, which made her miserable during the interview.  Plaintiff reported that she takes care of her daughter and cleans the house, but doesn't stay on her leg very long.  AR 178.

On examination, range of motion testing was normal and straight leg testing was negative. AR 180.  Plaintiff's left leg was 3 mm shorter than the right, and her left hip was held higher as a result.  Plaintiff's skin had several café au lait spots and there were numerous scattered lesions which seemed to be fibroma molluscum (papules typical of neurofibromatosis). Plaintiff's left knee bulged from the top of the knee down to the mid-tibial region anteriorly with soft subcutaneous tissue that felt lipmatous and was moderately tender.  The region was covered with superficial varicose veins and Plaintiff reported that the entire region was somewhat numb to the touch.  AR 180-181.  Plaintiff also had exquisite tenderness over the lower right rib cage anteriorly, with no abdominal tenderness.  Plaintiff's neurologic examination was normal, with normal muscle strength, bulk and tone.  AR 181.

Dr. Bass diagnosed neurofibromatosis with painful deformed left[2] leg from tumor activity and a probable small fracture or neoplastic involvement of the right lower anterior rib cage. He opined that Plaintiff could stand or walk for 30 minutes at a time, for a total of 4 to 6 hours, and sit for 30 minutes at a time, for a total of 6 hours. She did not need an assistive device for ambulation. Plaintiff could not kneel, crouch, crawl or climb. Plaintiff could push, pull, grasp, manipulate, finger and feel with her hands and arms without limitation. AR 181-182.

On April 20, 2007, State Agency physician S. V. Reddy, M.D., completed a Physical Residual Functional Capacity Assessment form. Dr. Reddy opined that Plaintiff could lift and carry 20 pounds occasionally, 10 pounds frequently, stand and/or walk for at least 2 hours in an 8 hour day and sit for about 6 hours in an 8 hour day. Plaintiff could not frequently push or pull with the left lower extremity and needed to be allowed to change position from sit to stand, or vice versa, for a minute every hour as needed to relieve discomfort. Plaintiff could occasionally climb ramps and stairs but could never climb ladders, ropes or scaffolds. She could occasionally balance, stoop, kneel, crouch and crawl. Plaintiff had to avoid concentrated exposure to hazards. AR 183-188. This opinion was affirmed on June 26, 2007. AR 196.

On April 26, 2007, Plaintiff began seeing Pamela Cushenberry, M.D. She complained of pain in her left knee for over a year and swelling. Plaintiff explained that it sometimes felt like her knee was going to give out. On examination, her gait was normal. Sensation was normal and she had no motor or sensory deficits. There was no atrophy and motor strength was 5/5 in all extremities. Plaintiff had no edema in any extremity and peripheral pulses were intact. There was pain with full extension of the knee and positive "Mcmurrays" with external movement. Dr. Cushenberry assessed joint pain in the left leg and prescribed naprosyn. She also ordered x-rays and referred Plaintiff to an orthopedist for further evaluation. AR 192-194.

On June 6, 2007, Plaintiff began treating with Jerome M. Weiss, M.D., for left knee pain. She reported difficulty with both knees, with the left significantly more symptomatic. Plaintiff reported that her knees were also weak and ranked her pain at an 8 out of 10. Walking and

---

[2] There are numerous instances in the records where it appears that the "left" leg was inadvertently referred to as the "right" leg. Where it is clear that is was an error, the Court has changed "right" to "left."

bending worsened her symptoms.  Plaintiff had 4 prior surgeries to her left knee and leg, as well as surgery at the Mayo Clinic for neurofibromatosis.  On examination, Plaintiff was in no acute distress and ambulated without a limp into the examination room.  Range of motion of the left knee was 0 to 100 degrees, with pain and crepitus on patellofemoral manipulation.  Soft tissue swelling was present over the lower leg, with a mass effect present to palpation.  Plaintiff also had various nodules of skin on various parts of her body.  Dr. Weiss diagnosed neurofibromatosis of the left leg, chondromalacia patella and osteoarthritis in the left knee, rule out recurrence neurofibromatosis or other.  He ordered an MRI and x-rays.  AR 300-301.

June 6, 2007, x-rays of her left leg revealed findings suggesting prior fracture of the left tibial diaphysis and possibly the left fibular diaphysis as well.  If she had no history of prior trauma, a nuclear bone scan was recommended.  AR 302.

Plaintiff underwent an MRI of her left knee on July 14, 2007.  The test revealed (1) a fairly large soft tissue mass involving the left knee joints, consistent with Plaintiff's history of neurofibroma; (2) severe chondromalacia and chondral delamination injury involving the medial knee compartment and medial patellar facet; and (3) a moderate-sized popliteal cyst.  AR 296-297.

Plaintiff returned to Dr. Weiss on July 26, 2007, and still had persistent pain in her left knee.  An MRI was consistent with neurofibroma.  The MRI also revealed chondromalacia and articular demyelination involving the medial compartment and medial patellar facet.  Plaintiff had an injection of Xylocaine and triamcinolone in her left knee.  AR 294.

On October 2, 2007, Plaintiff saw UCSF orthopedic oncologist Richard O'Donnell, M.D., at the request of Dr. Weiss.  She complained of bilateral leg pain, the left worse than the right, and rated it at a 6 out of 10.  On examination, Plaintiff had multiple cutaneous and subcutaneous neurofibroma, with no definite evidence of malignancy.  Examination of her left lower leg revealed an obvious recurrent plexiform neurofibroma beneath a healed surgical incision.  There were no areas of nodularity to suggest an area of malignancy and there were no areas of tenderness.  Plaintiff had full and painless range of motion in her knee, but she had severe patellofemoral crepitus.  AR 311-314.

After examination and review of Plaintiff's MRI and x-rays, Dr. O'Donnell explained that the neurofibroma lesion on her left lower leg has caused some chronic erosive change along the tibial cortex over the years. Plaintiff seemed to have a separate problem with respect to bilateral knee joint osteoarthritis, as evidenced by her physical examination findings of chondromalacia patellae and chondral changes on her scan. Dr. O'Donnell did not believe that Plaintiff had any evidence of malignant degeneration involving her left lower leg plexiform neurofibroma, nor in any part of her other lesions. He believed the knee pain is "simply" degenerative in nature or related to osteoarthritic change, and he did not believe that the neurofibroma is contributing in a significant way to her knee problems. Dr. O'Donnell did not believe that Plaintiff needed follow up at UCSF unless she developed a worrisome mass suggestive of a sarcoma. He suggested follow up with Dr. Weiss for routine orthopedic care. AR 311, 314.

On January 28, 2008, Plaintiff returned to Dr. Weiss. Examination revealed persistence of the neurofibroma deformities of the left knee and left lower extremity. Range of motion in the left knee was 0-115 degrees. Collateral ligaments were stable. Plaintiff had pain on patellofemoral manipulation. X-rays revealed considerable narrowing medially. He diagnosed osteoarthritis of the left knee and neurofibromatosis. Dr. Weiss discussed treatment for arthritis, including injections and possible arthroscopic chondroplasty. At 43, Plaintiff was on the "young side" for knee replacement, but it would be a future consideration if other measures do not help control her symptoms. AR 290-291.

On February 11, 2008, Dr. Weiss completed a Questionnaire in which he opined that Plaintiff was not precluded from performing full-time work at the sedentary level (lifting no more than 10 pounds, sitting for 6 hours and standing and/or walking for 2 hours), nor was she precluded from occasionally lifting 20 pounds, 10 pounds frequently. Plaintiff's primary impairment was pain. When asked to list objective findings on which his opinion was based, Dr. Weiss noted, "tenderness." At one time, Plaintiff could sit for 4 hours and stand and/or walk for 1 hour. When asked how long Plaintiff could perform these activities during an 8 hour day, Dr.

7

Weiss stated that she could sit for 4 hours and stand and/or walk for 1 hour. Plaintiff did not need to elevate her legs, but she could not run, jump, climb, kneel or crouch. AR 266.

Plaintiff returned to Dr. Weiss on February 28, 2008. Plaintiff received her first Synvisc injection in the left knee. AR 288.

Plaintiff saw Dr. Weiss on March 6, 2008, and reported no change in the left knee since the first injection, except that her left knee felt heavier. She underwent a second left knee Synvisc injection. AR 286.

Plaintiff returned to Dr. Weiss on March 13, 2008, for evaluation of osteoarthritis of the left knee. Examination revealed an apparent effusion. Plaintiff had a third Synvisc injection in herleft knee. AR 284.

On March 31, 2008, Plaintiff saw Dr. Cushenberry and complained of back and left knee pain. Plaintiff reported back pain for the past 2 years, with pain on standing and bending at the waist. She also reported that her right knee pain has worsened over the last year. She denied swelling but stated that it has given out and locks when she is driving. On examination, Plaintiff was in no acute distress. She had local tenderness, but no mass, in the lumbosacral spine area, as well as painful and reduced range of motion. Straight leg raise was negative at 60 degrees bilaterally, with right knee pain on full extension and positive "Mcmurrays" with medial deviation. Crepitus was noted on full extension. Dr. Cushenberry referred Plaintiff to Dr. Weiss for follow-up on her right knee pain. She was also prescribed piroxicam and baclofen. AR 280-281.

A right knee x-ray taken on March 31, 2008, was normal. An x-ray of her lumbar spine showed mild degenerative changes, most notably at L5-S1 endplate and facet joints, though the x-ray was called "essentially normal." AR 282.

Plaintiff returned to Dr. Weiss on May 1, 2008, and complained of worsening left knee pain. Dr. Weiss notes that Plaintiff was seen for an ongoing assessment regarding osteoarthritis of the left knee. Her symptoms were not improving even after a series of injections. On examination, her left knee was tender medially and laterally. The ligaments were stable. A well-healed incision was present with considerable soft tissue thickening with neurofibroma. Knee

replacement surgery was considered, but Plaintiff was on the "young side at 44" and the presence of the neurofibroma may create surgical problems. AR 276-277.

X-rays of Plaintiff's left knee taken the same day showed "extensive abnormality of the proximal portion of the left tibia of undetermined cause." A right knee x-ray was normal. AR 277-278.

In May and June 2008, Plaintiff saw Scott Bayliss, Ph.D. for treatment of depression. Notes from June 2008 indicate that she saw a psychiatrist and was prescribed medication. AR 322-323.

On June 18, 2008, Plaintiff saw UCSF orthopedic surgeon Kevin Bozic, M.D., at the request of Dr. Weiss. She reported bilateral knee pain, left worse than the right. Plaintiff described the pain as a severe, sharp, shooting pain and rated it at a 7 out of 10. The pain worsens with ambulation and strenuous activity, though Plaintiff also experienced pain at rest and at night. Despite oral anti-inflammatories, steroid shots and Synvisc shots, her problem has become progressively worse and now significantly impacts her quality of life. Plaintiff was currently taking Tylenol and antidepressants. On examination, Plaintiff walked with an abnormal Trendelenburg lurch to the right side due to a leg length inequality. Plaintiff had an obvious deformity and soft tissue masses over her left leg with a 2+ effusion in the knee and an S-shaped scar. Hip and right knee examination were normal. Plaintiff's leg knee had full extension to 120 degrees of flexion, pain on hyperflexion, medial greater than lateral joint line tenderness, and 2+ patellofemoral crepitus. Motor strength and sensation were intact. AR 324-325.

Dr. Bozic concluded that Plaintiff's knee pain is most likely related to the chondral injury in the left knee. He recommended a referral to Sports Medicine for a possible arthroscopic debridement of the chondral lesion. AR 325.

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairments of neurofibromatosis resulting in blood clots and left leg abnormality, and depression. Despite these impairments, Plaintiff retained the residual functional capacity ("RFC") to perform unskilled light work. Plaintiff could stand/walk for 2 hours in an 8 hour day, occasionally bend, stoop, twist, squat,

kneel and crawl, and occasionally climb stairs. Plaintiff could never climb ladders or scaffolding, work at heights or operate foot controls. AR 14-16. With this RFC, Plaintiff could not perform her past relevant work but could perform a significant number of jobs in the national economy. AR 25-26.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.,* *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See* *Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f). Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of her disability and (2) has an impairment or a combination of impairments that is considered "severe" (neurofibromatosis resulting in blood clots and left leg abnormality, and depression) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) did not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) could not perform her past relevant work, but (5) could perform a significant number of jobs in the national economy. AR 14-26.

Here, Plaintiff argues that the ALJ (1) erred at step two by failing to assess the severity of chondromalacia and osteoarthritis; (2) failed to give sufficient reasons to reject Dr. Weiss's opinion; and (3) failed to give sufficient reasons to reject her testimony.

**DISCUSSION**

A.    <u>Step Two Assessment</u>

Plaintiff first argues that the ALJ erred at step two by failing to assess the severity of chondromalacia and osteoarthritis.

At the second step of the sequential evaluation of disability, the ALJ determines whether a claimant has a severe impairment of combination of impairments. A severe impairment is one that significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 1520(c). An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work. even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a

minimal effect on his or her physical or mental ability(ies) to perform basic work activities). SSR 85-28.

Here, the ALJ determined that Plaintiff had the severe impairments of neurofibromatosis resulting in blood clots and left leg abnormality and depression. Plaintiff contends that the ALJ erred by failing to assess the severity of chondromalacia and osteoarthritis, which had been diagnosed by Dr. Weiss and Dr. O'Donnell and set forth in July 2007 imagining studies. AR 296-297, 300-301, 311, 314.

Plaintiff is correct that while the ALJ notes the diagnoses of chrondromalcia and osteoarthritis and discusses the examinations of Dr. Weiss and Dr. O'Donnell, he does not undertake a severity analysis of these impairments. AR 19-22. Any error is harmless, however, under the facts presented here. The ALJ determined that the neurofibromatosis in her left knee was a severe impairment, which both allowed the sequential evaluation process to continue and ensured that the impact on her knee was addressed in connection with the RFC. In other words, regardless of the name the ALJ gave to Plaintiff's knee impairment, the impact on the knee remained the same and was considered in the RFC analysis. *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir.2007).

Therefore, any error at step two was harmless. Nevertheless, as the Court is remanding this case for the errors discussed below, the ALJ should consider neurofibromatosis and chondromalacia at step two on remand. Remand will be discussed at the end of this opinion.

B.   Analysis of Medical Opinions

Plaintiff next argues that the ALJ erred in failing to adopt the February 2008 opinion of her treating physician, Dr. Weiss.

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir.2007); *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987). At least where the treating

doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir.1991). Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983).

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506. And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician. *Pitzer*, 908 F.2d at 506 n. 4; *Gallant*, 753 F.2d at 1456. In some cases, however, the ALJ can reject the opinion of a treating or examining physician, based in part on the testimony of a nonexamining medical advisor. *E.g., Magallanes v. Bowen,* 881 F.2d 747, 751-55 (9th Cir.1989); *Andrews*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir.1995). For example, in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a treating physician, "the ALJ did not rely on [the nonexamining physician's] testimony alone to reject the opinions of Magallanes's treating physicians...." *Magallanes*, 881 F.2d at 752 (emphasis in original). Rather, there was an abundance of evidence that supported the ALJ's decision: the ALJ also relied on laboratory test results, on contrary reports from examining physicians, and on testimony from the claimant that conflicted with her treating physician's opinion. *Id*. at 751-52.

Here, the ALJ adopted almost all of the April 2007 opinion of Dr. Reddy, the State Agency physician. The ALJ did not adopt Dr. Reddy's opinion that Plaintiff needed to change position every hour, though he did not explain his reasoning. AR 25.

In adopting Dr. Reddy's opinion, the ALJ rejected the more restrictive opinions of Dr. Weiss and consultive examiner Dr. Bass. The ALJ set forth Dr. Weiss's February 2008 opinion, but ultimately rejected it for numerous reasons. The ALJ first cited apparent inconsistencies in the report:

> Dr. Weiss stated that the claimant was not precluded from the sedentary level of exertion, but then stated that she could only sit for four hours a day. He stated that she [could] sit for four hours at a time, but then stated that she could sit for four hours in a day. He stated that she could sit, stand and walk in combination for four hours in an eight-hour day, but also stated that she did not need to lie down. Dr. Weiss did not explain what position other than lying down the claimant should assume after she had spent five hours sitting, standing and walking.

AR 25.

Plaintiff acknowledges that Dr. Weiss's opinion of her sitting and standing/walking abilities is not entirely clear because he suggests that the amount of time for which she could perform the activities at one time *and* during an 8 hour period is the same. His specific amounts of time are also inconsistent with the definition of sedentary work, of which he found Plaintiff capable.

A review of the questionnaire reveals that when asked if Plaintiff's impairment precluded her from performing sedentary work, he responded, "No." The next question asked whether her impairments restricted her to performing no more than sedentary work. He gave a response that did not answer the question: "treating arthritis of knee." AR 266.

Dr. Weiss also failed to answer how long Plaintiff could sit and stand/walk at one time. When asked how long she could do so at one time, he responded that she could sit for "4 hours per day" and stand/walk for "1 hour per 8 hour day." AR 266. When asked how long she could perform these activities over an 8-hour period, he gave the same answers- she could sit for "4 hours" and stand/walk for "1 hour." AR 266.

Rather than being inconsistent, then, his answers are not responsive to the questions asked. The ALJ's rejection based on this apparent inconsistency is therefore unsupported. Dr. Weiss's opinion was inadequate to allow for proper evaluation. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir.2001) (holding that ALJs have a duty fully and fairly to develop the record

only when the evidence is ambiguous or "the record is inadequate" to allow for proper evaluation of the evidence).

The ALJ next explains that although "the claimant complains of pain, it does not appear that Dr. Weiss has prescribed pain medication." AR 25. This statement, however, ignores the fact that Dr. Weiss injected Plaintiff's knee with Xylocaine, an anesthetic, in October 2007. AR 294. It also ignores Dr. Weiss's series of Synvisc[3] injections in February and March 2008. AR 284, 286, 288. While these injections may not have been "prescribed pain medication" that Plaintiff took at home, they certainly unravel the premise upon which the ALJ's statement is based- that Dr. Weiss's opinion was lessened because he did not offer Plaintiff treatment for pain.

The ALJ's statement is further undermined by Dr. Weiss's notation in May 2008 of Plaintiff's current pain medication- piroxicam[4] and baclofen[5], prescribed in March 2008 by Dr. Cushenberry. AR 276, 280-281. Both medications are used to treat inflammation and pain. Obviously, there would be no need for Dr. Weiss to prescribe pain medication when it was already prescribed by Dr. Cushenberry.

Finally, the ALJ rejects Dr. Weiss's opinion because although Dr. Weiss referred Plaintiff to UCSF, "it does not appear that he followed the recommendations of UCSF." AR 25. In October 2007, USCF physician Dr. O'Donnell recommended that Plaintiff return to Dr. Weiss for routine orthopedic care. AR 311, 314. In January 2008, Plaintiff did indeed return to Dr. Weiss and continued her treatment with him through May 2008. Dr. Weiss provided treatment for osteoarthritis, including injections for pain. The ALJ does not explain why such treatment

---

[3] Synvisc is an artificial joint fluid that is injected into the knee to relieve pain for 3 to 6 months. http://www.nlm.nih.gov/medlineplus/ency/article/000423.htm (January 9, 2012).

[4] Piroxicam is used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684045.html (January 9, 2012).

[5] Baclofen acts on the spinal court nerves and decreases the number and severity of muscle spasms, relieves pain and improves muscle movements. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682530.html (January 9, 2012).

did not comply with Dr. O'Donnell's recommendations and his statement is therefore unsupported.

Accordingly, the ALJ's rejection of Dr. Weiss's opinion is not supported by substantial evidence and was not free of legal error. The Court will discuss remand at the end of this opinion.

C.      Plaintiff's Subjective Complaints

Plaintiff argues that the ALJ erred in assessing her subjective testimony.

In *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), the Ninth Circuit summarized the pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's subjective complaints:

> An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989). However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific, cogent reasons for the disbelief.'" *Morgan*, 169 F.3d at 599 (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id*. Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id*.
>
> Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); *see Daniels v. Apfel,* 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

In rejecting Plaintiff's testimony, the ALJ began by explaining that although Plaintiff complained of back, neck and shoulder pain, she had rarely sought treatment for these conditions since 2004. AR 24. Plaintiff did not describe troubling neck[6] and shoulder pain at the hearing, however. Plaintiff described mainly pain in her knees and back, complaints which are mirrored in the medical record. Although the majority of the treatment notes focused on her knee pain,

---

[6] Plaintiff testified that her neck does not bother her as much as it used to. AR 43.

Plaintiff complained of low back pain in 2007 and in 2008, she reported back pain for the prior two years. AR 178, 280. During the March 2008 examination, she had mild local tenderness in the lumbosacral spine and painful, reduced range of motion. Dr. Cushenberry ordered lumbar spine x-rays, which showed mild degenerative changes, most notably at L5-S1 endplate and facet joints. AR 282. While her complaints of back pain did not match those of her knee pain, it is inaccurate to conclude that Plaintiff rarely sought treatment since 2004.

The ALJ next explains that although Plaintiff alleged disability since June 1, 2006, she did not seek treatment until April 2007, "the same month her claim was initially denied." AR 24. The ALJ is correct that Plaintiff did not establish care with a physician until April 26, 2007, the same day her claim was denied. AR 56, 192-194. The only other treatment between June 2006 and April 2007 was a January 2007 consultive examination requested by the Commissioner. AR 178. Moreover, although Plaintiff was seen periodically for knee pain from 2000 through 2004, her last treatment prior to establishing care in April 2007 was in December 2004. AR 203. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir.2008) (unexplained failure to seek treatment or to follow a prescribed course of treatment is a credibility factor). This was a permissible factor in the analysis.

Similarly, the ALJ questions the lack of alternate forms of treatment, such as physical therapy or referral to a pain management specialist. AR 24. It seems unwise, however, to question Plaintiff's credibility based on medical professionals' decisions about forms of treatment. This is especially true where, as here, Plaintiff received consistent treatment and there is no evidence that she did not follow prescribed treatment. Moreover, the ALJ seems to suggest that Plaintiff should have sought alternate treatment, but permitting the ALJ to question Plaintiff's credibility based on whether she asked her doctors for certain forms of treatment again undermines the role of the medical professional and suggests that the ALJ is improperly asserting his own medical opinion. *Gonzalez Perez v. Sec'y Health & Human Serv.*, 812 F.2d 747, 749 ("The ALJ may not substitute his own layman's opinion for the findings and opinion of a physician.").

The ALJ continues his analysis of Plaintiff's treatment with incorrect statements. The ALJ states that Plaintiff did not seek "referral to a psychiatrist," yet her psychologist's treatment notes in May and June 2008 indicate that Plaintiff was referred to a psychiatrist. AR 322-323. Notes from June 10, 2008, state that she saw Dr. Go, a psychiatrist, for medication evaluation. AR 322.

A few sentences later, the ALJ recognizes that Plaintiff sought treatment for depression, but "for only a short while." AR 24. However, Plaintiff had just started her treatment in May 2008, and at the time of the June 2008 hearing, there was no indication that she did not intend to continue her treatment. Moreover, the ALJ cannot fault Plaintiff for delaying mental health treatment. *Nguyen v. Chater,* 100 F.3d 1462, 1065 (9th Cir. 1996). ("[A]ppellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.") (Internal citations omitted).

The ALJ also misstates the record when he states, "[s]he has not even been prescribed pain medication." AR 24. As discussed above, Dr. Cushenberry prescribed naprosyn in April 2007 and began prescribing piroxicam and baclofen in March 2008. AR 192-194, 276, 280-281. Dr. Weiss also provided injections for pain.

The ALJ next questions Plaintiff's complaints based on the objective evidence. For example, according to the ALJ, although Plaintiff stated in her Daily Activities Questionnaire that "her leg was always swollen to three or four times its normal size, Dr. Weiss stated that it was not due to an inflammatory process." AR 24, 132. The ALJ concludes that the "swelling" was due to soft tissue masses rather than any abnormality of the knee itself. AR 24. Regardless of the cause of the "swelling," however, the fact remains that it was often larger than her other knee and questioning Plaintiff's credibility on this basis is improper.

Finally, the ALJ questions Plaintiff's allegations based on her daily activities. For example, he notes that although Plaintiff stated on the Daily Activities Questionnaire that she did not lift anything, she later stated that she loads the dishwasher. AR 24, 133. He also explained that Plaintiff described very limited daily activities, yet no physician ever noted signs of atrophy

or weakness. AR 24, 39. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) ("In addition, the ALJ noted that Meanel did not exhibit muscular atrophy or any other physical signs of an inactive, totally incapacitated individual."). These are valid considerations.

The ALJ's credibility analysis therefore relies on both proper and improper factors. While the Court can uphold a credibility determination where the ALJ made an error, it cannot do so where the errors outweigh proper factors. The ALJ's analysis was not supported by substantial evidence and is not free of legal error.

D.   Remand

Section 405(g) of Title 42 of the United States Code provides: "the court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." In social security cases, the decision to remand to the Commissioner for further proceedings or simply to award benefits is within the discretion of the court. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. Where, however, a rehearing would simply delay receipt of benefits, reversal and an award of benefits is appropriate." *Id.* (citation omitted); *see also Varney v. Secretary of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no useful purpose would be served by further administrative proceedings, or where the record has been thoroughly developed.").

The Court has determined that the ALJ erred in his analysis of the medical opinions and in his analysis of Plaintiff's subjective testimony. As the Court explained above, Dr. Weiss's opinion was inadequate to allow for proper evaluation and the Court therefore finds that remand is appropriate. On remand, the ALJ should clarify Dr. Weiss's opinion and undertake a new analysis of the medical evidence. In light of the new evidence, the ALJ should consider the diagnosis of chondromalacia and osteoarthritis and reanalyze Plaintiff's subjective testimony.

**RECOMMENDATION**

Based on the foregoing, the Court finds that the ALJ's decision was not supported by substantial evidence and was not based on proper legal standards. Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be GRANTED and that JUDGMENT be entered for Plaintiff Tracie Still and against Defendant Michael J. Astrue.

This Findings and Recommendation will be submitted to the Honorable Lawrence J. O'Neill pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within thirty (30) days after being served with this Findings and Recommendation, the parties may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **January 11, 2012**              /s/ **Dennis L. Beck**
                                    UNITED STATES MAGISTRATE JUDGE